Thank you, Your Honor. Ken Peterson for Appellant Stone. And I want to congratulate the students on their new facility and thank the staff for the opportunity to come and argue in this very attractive venue. And if I may, reserve five minutes for rebuttal. And if I may, to open, ask the panel if there's any specific questions I can address at the beginning. I do have one, Mr. Peterson. If you could work into your argument an identification of the specific protectable or expressive elements from your maps that you allege Perpetual Motion copied, I would appreciate some help in that regard. Very well. And thank you, Judge Tolman. Let me start with that, then, if I may. The declaration of Lynn Stone. And that's in the appellant's excerpts of record. First declaration of Lynn Stone, page 9. And the second declaration of Lynn Stone, page 100 of the excerpts of record. Your Honor, there is, and all of you, there is a list of specific elements that Ms. Stone claims to have been misappropriated, that is copied. And it goes really to the heart of our case and the crux of the appeal. The complaint is about maps, 13 maps in her text, Adventures. Those maps were copied by the defendant, which is admitted, used by the defendant to make its maps for its two books, Good Dirt 1 and Good Dirt 2. The particular protectable elements of Stone's maps are the lines of the trail, the lines of the road, the lines of the environmental geographic elements. Well, let's talk about that. I was going to say, to the extent that those lines represent geographic features in the world, the existence of those geographic features is not a copyrightable thing. So what is it that is so unusual about the lines that represent that, that would make them protectable? That's the crux of the matter, Your Honor. The map is not a fact. The representation on the map is abstractions, representations, schematics of the facts. And I believe this is the issue that was missed by Judge Carter, respectively, when he analyzed the maps. The maps are visual images. But, Mr. Peterson, my concern is the same. As I understand it, Ms. Stone started with the geodetic survey maps, which were prepared by the United States Geodetic Survey. And those maps commonly used for the expression of the location of a road, a black line. They were used for the expression of an unimproved road, a dashed line. And they used for the expression of a trail, a dotted line. What has your client done that is expressive or added some kind of a component or a feature that is not itself copied from a map that is in the public domain? Your Honor, first, selection in the nature of a compilation. Organization in the nature of a compilation. The map then has a second facet, not only as a visual image, but as a compilation of an abstraction of the facts represented by the map. Well, it seems to me you've got the same question then. The selection of facts in the good dirt maps. Even if it's true that the author of that volume used as one of his resource materials, your client's maps, he's making his own selection so that if you put two maps side by side, they they give different appearances. Why? Why isn't that map separated from your client's map in the same way that you say your client's map is separated from the USGS map? Your Honor, because of the way that the second set and the third set of maps were created. The process of creating the maps in Dirt 1 and Dirt 2 was wholesale copying of the map from adventure. Your client started with the USGS maps. But, Your Honor, if I may, and we offered the USGS maps to Judge Carter. He declined to have them admitted, saying that everybody knew what they were. Well, can't we take judicial notice? You may. And I think it's a good idea to compare a USGS map. There is no emphasis. A road in a GS map is either a federal, a state, a county, or a local road. They're all the same. In addition. But my question is, they're all the same, but they're depicted with a solid black line. So what is your client added when she uses a solid black line? Her lines are not the same. Her trails are not the same. That's apparent from her declaration. She rode these maps. She was a single mother with a child she was supporting, and together they rode these maps. They selected, summarized, abstracted, compiled. But maybe I'm not making my question clear. Go ahead. She depicts a road with either a solid line, which I assume means a paved road, with a double line with space in the middle, which I assume means a less improved road. And then shows at some point that there are feeder roads that are depicted, you know, with dashed lines. So those are common cartographers' symbols. And I don't see what your client has added by the way of selecting that particular style that makes this map copyrightable. Your Honor, if I may direct you to. Or I should say that makes this map copyrightable subject to infringement when somebody else uses the same symbol. Right. Your Honor, if I may direct you to the appellant's excerpts of record. Page 23, Exhibit B. Those are eight pages of Stone's map. Are these the ones that are numbered D-158, 159, and so on? D-158, 159 comes, I believe, from the supplement of record. Are we talking about those maps? Is that what we're looking at? Yes. Okay. I'm with you. I have a set time. Yes. The trails depicted by Stone are in the graphic representations are continuous and uniform. But in real life, the trails come off the beaten path onto a less beaten path, closer to a gravel road, next to a paved road. And yet the depiction, for the benefit of the reader, is a consistent, smoothly curved curve, which is the artistry of Stone. In the USGS map, some of those trails are gravel. Some of those trails are two-track. Some of those trails are single track. And some of those trails were in existence or not in existence or being developed by the use of other hikers and bikers. So the artistic license, if I can use that, I probably shouldn't use the legal term, but the artistic talent that your client is claiming, is the license that she took to vary the actual path of the road or the trail so that it is not quite as accurate as depicted in the USGS? Your Honor, not to be less accurate, but to be more informative. Here's the point. If you take a USGS map and I say, you go out and do Custer City Loop. Okay, I'm with you. You're going to have trouble. You're not going to know where Custer City Loop is. You're not going to know when you come to a fork in the path which is the trail for you. If the trail begins to peter out, you will lose confidence and maybe turn around. Except what she has done for you is provided the path for you. And that's done with the depiction by arrows? I'm looking, for example, at D-185. Not only the arrows, Your Honor, but the actual path. And the path there shown consistently for attractiveness, whether it's gravel, two track, single track, or just a cow trail or an elk trail. Counsel, you are down to about four and a half minutes if you wanted to save that for rebuttal. Let me just finish if I may. So both parties thought they had a strong case. We thought we had copying. I think as a matter of fact, we do. Well, the district court found as a matter of fact you did not. Right. So don't we have to apply a clearly erroneous standard to the district court's factual determination? Not in the context of a motion for summary judgment. That is, the court not only identified the factual issues which were contested, and I refer you to the appellee's supplemental record, where they include their own response to indicate that facts are disputed. The judge wrongfully but respectfully decided the facts, the contested facts, and, in my opinion, decided them wrongfully. Counsel, you said something that causes me to want to ask you another question before I let you go. Sure. You said that each of you thought you had a strong case. Have the parties made any use of the circuit's mediation program to attempt to settle their differences? Your Honor, Stone did. I can say that emphatically. Stone did, and has, without response or success. Okay. So finally, the problem with Judge Carter's process and decision is this filtering, this dissection. He thinks he's factoring out facts, but no, he's factoring out the abstraction, the compilation, the artistic expression of facts in the method. I understood his ruling to be, I don't see evidence of copying. Is that the same thing? In other words, as I understand his order, it's a failure to establish a prima facie case to entitle you to proceed. That's why he grants summary judgment in favor of the defense. No, I read it differently, Your Honor, respectfully. He decided that there was copying, which is admitted of the maps. I've got to stop you here, because copying is used in two different senses here. It is admitted that the author of the Dirt books used photocopies of your client's maps in the preparation of his. And I think the judge's order is a conclusion. That is, taking the final product that's published, because Good Dirt didn't publish the photocopies. Good Dirt published a new product. And the question being answered by the district court, I thought, was putting these two side by side, is one a copy of the other? And he decided it was a matter of law. No, it's not. So you can't make that a case for infringement. That's not the same as saying, well, they're copying, photocopying used as a resource material along the way. And, in fact, the fact that there was photocopying used along the way does not establish, in my mind either as a matter of law, that there is copying in a legal sense. Yes, Your Honor. There is, however, the development of a derivative work, which was not developed by Judge Carter. Well, I think the whole doctrine of derivative work speaks to something other than what we're talking about here. If I'm researching a paper, which I will ultimately publish, and I photocopy some articles for use in writing that paper, what I'm doing would not ordinarily be described as a derivative work of whatever it was I photocopied as a resource material. Right. But the facts here are, you copy the piece, you turn it over to a clerk, and you say, print it. That's what happened here. And that's the declaration of Phillips. She took the maps marked up by McRoberts, and from those maps, with a computer program, made his maps. And, Your Honor, if you would go to the supplemental excerpts. Can you identify, in your briefing, you talk about virtual duplication. Can you identify your best case of what you would describe as virtual duplication between the published maps and each of the books? Yes, Your Honor. Let me do that. And that's in the supplemental excerpts of record. And I think the strongest example. Pardon me. Go to D 174. The map from Adventures on the right has been truncated, beginning at about the narrowest in the middle of the page. And that image on the left is a duplicate. That's a copy. Well, truncated, it's a different scale to begin with. Your Honor, please refer to the text in the records. These are defendant's exhibits, and some of these were increased in size and diminished in size when they were made for the exhibit. In addition, the ability with a computer to scale up, scale down, truncate left, right, top, bottom, that's a keystroke of a technician, not an author. But you're alleging copying. And I'm looking at Quigley Gulch Road. Which is? On D 174 in the good dirt. And I'm comparing it with what I presume is the road coming out of Haley in the Adventures map. And those two roads don't appear to me to be the same, even on a different scale. One shows Quigley Pond next to it. The other shows Quigley Creek running parallel to it. One has different curves in it. One has a dashed line where the other one has a solid line and a portion. So, again, I'm back to my copying concern that my brother Judge Clifton did such a good job of articulating better than I my question. Where's the copy? Your Honor, in my opinion, and it's a humble opinion, those maps are copies of one another except for non-essential details. Counsel, you have exceeded your time. So pardon me, Your Honor. Thank you. We'll restore a little bit for rebuttal. We asked a lot of questions. So we'll hear now from Mr. Shaver. May it please the Court. My name is Robert Shaver for the appellee. I hope you're out of questions now. Not quite. Hope springs a turn. This case is about two books or rather three, three books. One is Adventures, which was written in 1990 by Stone. The other two are first and second edition of Good Dirt One and Good Dirt Two, which I'll just refer to as as good as good dirt. From the beginning of this case, we have felt that that what was needed in the Ninth Circuit is that to prove copyright infringement, you had to look at two tests, an extrinsic test and an intrinsic test. And we looked at the extrinsic test first, obviously, and the one I would refer you to. And maybe I can make the appellant's case so that I can rebut it here. I would look at the supplemental excerpt of record number 166. And I can tell you some of the copyrightable features that are on that page. Such features as the notation of a faint road, the ski trail, the Buster Back Ranch, Bluebird Lane. These kind of notations are probably obtained from on site investigations and maybe from riding the roads or at least from compiling two separate sets of maps. Investigation by whom? We don't know that. We do know that your client did make photocopies of plaintiff's maps and used those. Yes. And I think that's the foundation of the case, that instead of using something that came from the public domain or something that he created entirely on his own, he did build upon the plaintiff's work. And so to the extent that the plaintiff's maps were used, they took advantage of plaintiff's hiking of those trails and plaintiff's personal identification. Except that in the record you'll find that he also wrote them. What he did was copy six pages, which was a very convenient and ill-advised method of sketching out his trails, handing them off to the artist and said, here are my routes, draw some maps for me, here's 4,000 bucks. One of the particular concerns that I have about the case is something else that counsel emphasized perhaps more in the briefing than he did today. And that is that assuming that the physical facts in the world are not themselves copyrightable, the plaintiff's maps in some cases were inaccurate with respect to the physical world. And rather than go with the facts of the world, in some cases your client borrowed those inaccuracies, which were created by the creative product of the plaintiff. What's your response to that? Legally, a person can take facts and use them even if the facts are wrong. Well, what fact was taken? The only fact could be that Adventures has something wrong. If you consider the fact of where one road crosses another, if you consider that a fact and it's wrong, a person can take that and mistakenly use it. But another factor here is the same artist drew both maps. And it's kind of to be expected that there'd be some similarities. But the artist isn't the one who determined, as I understand the declarations, the artist is not the one who determined the location as distinct from the depiction of the location of objects or roads or whatever. Is that true or not true? I think the author of the book chose the route, actually. He drew him on a map and handed him to a mapmaker and felt that a lot of the depictions of where a stream crossed a road or small typographical details where a picnic area was depicted were within the purview of the mapmaker. And I don't know that he directed every one of those features to be located where it is. But you're not suggesting that he's not responsible for what she did. Well, it's his book. You know, she is. She is not the defendant. He is. But whatever. Even even if there is copying. And there are some things that are similar where roads cross or that two of them are depicted as intersecting when really they're offset a bit. Or a road crosses another road 50 feet away from a stream instead of 300 feet, as it might be in real life. The plaintiff says those things are there. And in aren't those protectable elements because they are fanciful, if you will. Renderings of the world that are not accurate. I don't think they are. I think they're mistakes. And they're mistakes in fact. And even their mistakes that your client corrected. Is there anything in the record that indicates in the copying in the six pages, whatever number of pages of copies from the adventure book? He changed something because he determined by his own writing of the trail that it was an inaccurate depiction. We know that that he and the artist went through an iterative cycle to revise maps. I don't know of any specific mistakes that he corrected. We do know there's a statement from the artist, the map maker, that she was deliberately trying to make the maps consistent. She identified at least one mistake that she attributed to herself. I've forgotten what it was, but a mountain that she placed because she thought the mountain was there. Right. But you talk about your client having ridden these trails and made his own investigation. It would be useful to show his independent contribution if we could identify something that he changed because he decided what was depicted in the adventure's book. That wasn't right. So he was going to fix it because there's no affirmative reason I could understand for a guidebook to want to show something inaccurate. That's why I think the inaccuracies are significant, because it suggests that rather than investigate and do independent work and apply his own mark on it. He just took what he found in the plaintiff's book and went from there. So if we could find some changes that he made, I think it might be useful. What we do have in the record is his analysis of each of the points that the plaintiff made. For every road crossing or that this road is single track when you show it double track, for every one of those, he explained his reasoning. And probably in 80 percent of the cases, he explained that he had some personal knowledge and the map was consistent with his personal experience. In some of them he said, well, this was a detail that I was counting on the map maker to take care of. And in any degree of copying, you still have to have a side by side comparison and there has to be substantial similarity. By whom? If the standard is whether the maps are substantially similar, isn't that by definition a jury issue that precludes the entry of summary judgment? Well, I guess two district court judges didn't think so. They thought it was clear enough that they felt no reasonable juror could find that. But that's an issue we reviewed de novo. That's right. That's right. And I encourage you to do a side by side comparison for substantial similarity. Let me ask you a theoretical question that will help me, even though it's not, I know you don't concede that this is exactly the fact, but let's assume that there is an artistic rendering of something and that someone takes, without any alteration, takes a piece of it so that it can't be said that they're the same. One is a bird's eye view of the left hand lower corner of the original work, but doesn't make any changes. It can't be said that they're substantially similar in the sense that you've only taken one-fourth or one-eighth, but it's exactly the same thing and you've now reprinted it in your book. What result? Is that a copyright infringement, even though it's only a bird's eye view of one-fourth or one-eighth of a painting or of an artistic rendering of something? Well, one of the cases, one of the two cases that was just submitted very recently by the plaintiff, I think had a fact pattern similar to what you're talking about. And it was where they took a carpet design, which was symmetrical, and they copied half of it and stretched it and made it asymmetrical. If that's what you're thinking, the court in that looked at the fact that the parts that were left out were the identical parts that were left out, and it was not every other thing, but it was a leaf here and a leaf there. And I think one way to look at this map thing is... Well, is that an infringement or not an infringement? The court decided it was because exactly the same things in a very selective way work. So if we were to determine that the plaintiff's maps contained significant protectable elements, then the mere fact that your client has a more focused view and has left out, has taken half the map and not the whole map, not as far away from Haley or whatever, that in itself doesn't preclude a finding of copyright infringement. I wouldn't think so, because you said the words protectable elements. Right. And I know you don't concede that most of the elements are protectable. And I guess when I think of these maps, I think if you want to draw a map of a route here, you ought to be able to take a blank sheet of paper and add the features that you needed. And the features that you would add would be point A and point B, you know, between which the ride is going to go, which is maybe Alturas Lake and Pettit Lake on page 166. And the relevant highways, the relevant side roads. And I think Judge Tolman is right that a heavy, dark line is considered a main road. A double spaced line is a secondary road. A double dotted line is an unimproved road, dirt road, jeep road. And a dashed line or a dotted line is a trail. You ought to be able to add lakes, streams, roads, trails, and use that map and add names to them and towns. And that's basically what the defendant's maps are. That's all they are. Well, I think that the issue, the twofold issue for me is that he didn't start with a blank piece of paper. He started with the information compiled by and artistically arranged by the plaintiff. And the second are the inaccuracies that we've been talking about, that those are not the same as just starting with point A and point B. And I guess those are the issues of concern to me in the case. On some of them he, on six of them he used, he copied pages from her book. The rest of them, and there are 74 maps he used, USGS maps, handed them to the artist. And, you know, responsible for the artist's work, but the artist had drawn both sets of maps. And I guess if she can't use her previous maps, we're sort of making a rule that an artist can't use her previous work. And even if she, you know, another of our arguments is the artist who made the maps for Stone was a co-author of those maps. And she had a right to make copies or derivatives. But the copyright, she didn't hold a copyright officially, did she? She didn't hold a copyright, but a person can file a copyright and a separate copyright still exists for a co-author. Why wouldn't she have been doing a work for hire? In other words, she's simply being paid as part of her job to produce copyrighted material for her employer. Why wouldn't that be the case? Well, she was an independent contractor. And the definition of a work for hire is not someone who's just paid to do some work. There are some specific definitions of the type of work that qualifies for a work for hire. And she was an independent contractor. And according to the copyright law, until she assigns her rights to those works, she still owns her rights. But doesn't our decision in all Muhammad versus Lee control the joint author inquiry? Don't you have to show evidence of intent to make her the co-author? And the most obvious piece of evidence that I can imagine is that on the spine of the book, she's listed as an author. And instead, what we find is an acknowledgment that she was the illustrator, the map maker. Well, there are the al-Muhammad case. You know what that case is. They specified several. It's the controlling case. That's what it is. The question is, how do you distinguish it? They specified several things to look at in determining who's a co-author. And one is the intent of the two parties to define themselves as such. And we find in the Adventures book that the map maker is cited three times as being the author of the maps, the creator of the maps. Another factor is the importance of the maps to the work that's generated. And the plaintiff concedes the maps are the most important thing. Without the maps, there would be no guidebook. Another thing is the contribution of the maps to the profitability or the commerciality of the thing. In all of those ways, the map maker looks pretty much like a co-author. How does that help you? Because if she's a co-author, the plaintiff is still the other co-author. And can one co-author, without the permission of the other, infringe the original work? Yes. The co-author can make derivatives of their own work. And no suit can lie against a co-author for his own copying his own work. Even if there's another. So there's one person in the middle who's a co-author with someone over here and then goes and is a co-author with someone over here. So this person over here just gets away with infringing work number one. Right. They're co-authors. They're equally free to use it in any way they want. The Copyright Office doesn't determine who the author is or not. They just register what's sent to them. And a copyright can be registered and valid if it lists one author when there are really two. But the unlisted author still has a copyright and the right to use that. Counsel, you've exceeded your time. But I do have one last question for you, which is similar to one I asked the opposing counsel, and that is whether, in your view, it would be productive for the parties to turn to the mediation services of the circuit. I don't believe it would be productive. The only progress of mediation has been we. You don't have to give me the details. It hasn't been successful. Let me clarify something. You've asked for an award of attorney's fees on appeal. Did the district court award your client attorney's fees? No, it didn't. Thank you, Counsel. We used up a lot of your time with our questions, so you may have two minutes for rebuttal, if you'd like to use them. I appreciate it. First, let me just address that Judge Carter below did not address co-authorship and, in fact, specifically declined to decide on it. And I don't think that issue is properly before me and even possibly properly before you. Well, he didn't reach it because he found no infringement. So there was no need to decide whether or not there was a co-author, right? But does that mean that the defendant is precluded from raising that issue on appeal as long as it was raised below, even though the district court didn't pass upon it? Your Honor, it may legitimately be an issue, but it's an issue, again, of fact. So we would have to send it back to Judge Carter if we reverse his determination that there was no copying for no infringement? Because it would be a defense to the infringement. Yes, Your Honor, I believe that is true. And if I may close just briefly, and this goes to the issue of copying and the issue of similarity, substantial similarity or the lack thereof. In the appellant's excerpt of Record P118 in the middle of the page is McRoberts' own declaration. This is his own language. In fact, Phillips stated that she used the place her mind symbols on Stone's maps. So she wanted to use them on my maps to be consistent. And I think that is the emphasis in the words of the principle opinion, to be consistent, to be consistent with the prior other maps of Stone. Well, we're back to my problem with black lines and double lines. Isn't a placer mind symbol a common cartographer's representation of the location of a mind? Well, Your Honor, in some cases in the maps, Stone's graphical representation are peaks for peaks, little inverted V's, and McRoberts' representation is a black triangle for this summit. There's a selection, certainly, but the detail selection by McRoberts, working from the maps of Stone are insufficient to create dissimilarity between the artistic expression of Stone and the copies of McRoberts that end up as the maps in Dirt 1 and Dirt 2. Thank you, counsel. Thank you. We appreciate the arguments of both parties. They've been very helpful. And the case just argued is submitted.
judges: Graber, Tallman, Clifton